RICHARD L. HEALER[1] & others[2] *vs.* DEPARTMENT OF
ENVIRONMENTAL PROTECTION & another.[3]

No. 08-P-787.

Suffolk. February 9, 2009. - August 20, 2009.

Present: McHUGH, COHEN, & GRAHAM, JJ.

*Massachusetts Clean Water Act. Administrative Law,* Judicial review, Substantial evidence, Agency's interpretation of regulation. *Municipal Corporations,* Conservation commission, Sewers. *Department of Environmental Protection. Permit.*

Discussion of the Clean Water Act, G. L. c. 21, §§ 26-53, and the Department of Environmental Protection's regulation of the discharge of pollutants into the groundwaters of the Commonwealth. [11-12]

Discussion of the standard of review employed by this court in reviewing a decision of the commissioner of the Department of Environmental Protection. [12-13]

Plaintiffs appealing from a decision of an acting commissioner of the Department of Environmental Protection, which affirmed the grant of a groundwater discharge permit to a town for the construction and operation of a wastewater treatment facility and leach field, failed to demonstrate that the department erred by not establishing permit conditions providing for a larger separation distance between the facility and the plaintiffs' private drinking wells [13-14] or for monitoring the facility's discharge [14-15], based on the plaintiffs' most pessimistic or speculative concerns regarding pollution; further, there was no merit to the plaintiffs' contentions that they produced evidence sufficient to shift to the town the burden of proof with regard to speculative and unsupported assertions regarding the risk of harm

---

[1]Individually, as cotrustee of the Healer Nominee Trust, and as trustee of the trust under the will of Harry J. Healer.

[2]Warren C. Healer and H. Janet Healer, individually and as cotrustees of the Healer Nominee Trust; Harry J. Healer, Jr., individually, as cotrustee of the Healer Nominee Trust, and as trustee of the trust under the will of Harry J. Healer; Eleanor Maurer, Michael Spellman, Tracey Spellman, Paul J. Byrne, Steven M. Cross, Kenneth S. Johnson, Rosemary Johnson, Carla H. Healer, Lionel Barry Evans, Eleanor M. Evans, John J. Maurer, Frances Maurer, and Jonathan L. Snyder, individually and as members of the Falmouth Residents for Fair Sewage Treatment; and John V. Hanscom, individually, as executor of the will of Helen F. Hanscom, and as a member of the Falmouth Residents for Fair Sewage Treatment.

[3]Town of Falmouth.

posed by the facility to the plaintiff's drinking wells [15-16], or that the treatment plant's discharge would harm nearby wetlands [16-17].

An acting commissioner (commissioner) of the Department of Environmental Protection, in affirming the grant of a groundwater discharge permit to a town for the construction and operation of a wastewater treatment facility and leach field, did not improperly reject an alleged finding of an administrative magistrate that the discharge from the facility would degrade the groundwater [17-18], and neither the commissioner nor the administrative magistrate failed to give due weight to the testimony of an expert offered by abutters to the site [18-19].

CIVIL ACTION commenced in the Superior Court Department on November 24, 2006.

The case was heard by *Regina L. Quinlan,* J., on a motion for judgment on the pleadings.

*Alexander M. Joyce* for the plaintiffs.

*Frank K. Duffy, Jr.,* Town Counsel, for town of Falmouth.

*Annapurna Balakrishna,* Assistant Attorney General, for Department of Environmental Protection.

GRAHAM, J. This case arises from the grant of a groundwater discharge permit (permit) to the town of Falmouth (town) for the construction and operation of a wastewater treatment facility (treatment facility) and leach field.[4] The plaintiffs are abutters to the site of the proposed treatment facility or the proposed leach field, and some or all of the plaintiffs rely on private water wells near the site of the proposed treatment facility or leach field as their sole source of drinking water. Acting on the plaintiffs' motion for judgment on the pleadings, a judge in the Superior Court upheld the decision of an acting commissioner (commissioner) of the Department of Environmental Protection (department) affirming the grant of the permit to the town.

On appeal, the plaintiffs argue that the commissioner erred in granting the permit because (1) the permit does not provide a reasonable margin of safety to account for any lack of knowledge

---

[4]In June, 2002, the conservation commission of Falmouth (commission) issued an order of conditions approving the town's plan to construct the new sewer system and treatment facility. The order of conditions and a superseding order of conditions issued by the Department of Environmental Protection were the subject of two appeals before this court. See *Healer* v. *Conservation Commn. of Falmouth,* 63 Mass. App. Ct. 1117 (2005); *Healer* v. *Department of Envtl. Protection,* 73 Mass. App. Ct. 714 (2009).

concerning the impact of the treatment facility's discharge on the quality of the groundwaters and on nearby residential homes served by private drinking water wells; (2) the permit does not contain monitoring requirements for known toxic pollutants that are found in residential sewage; (3) the town failed to meet its burden to prove that the discharge from the treatment facility would not harm downgradient drinking water wells; (4) the treatment facility's discharge would harm nearby wetlands; (5) the commissioner improperly rejected an alleged finding that the discharge from the treatment facility would degrade the groundwater; and (6) both the administrative magistrate and the commissioner failed to give due weight to the testimony of the plaintiffs' expert, who opined that discharge from the treatment facility would harm nearby wetlands. We affirm.

1. *Factual background.* The treatment facility is part of a plan developed by the town to address a public health emergency within the New Silver Beach area of Falmouth. The New Silver Beach area lies in an area of low elevation by the waters of Buzzards Bay. There is no public sewer in the New Silver Beach area; approximately 210 homes located in the area are served by private septic systems. Due, in part, to high groundwater, many of the private septic systems do not satisfy the regulatory standards governing on-site sewage treatment and disposal systems (Title 5 standards).[5]

The town plans to alleviate the problems in the New Silver Beach area by piping wastewater from New Silver Beach approximately 1.5 miles inland to the newly constructed treatment facility. The treatment facility will use sequencing batch reactor technology, a biological treatment system designed to remove nitrogen from wastewater. Treated wastewater, or "effluent," will be discharged into the ground through a leach field constructed to the rear of the site of the North Falmouth elementary school. Although the elementary school currently has a septic system that satisfies Title 5 standards, the town plans to treat wastewater from the elementary school at the treatment facility. The permit limits the treatment facility to a discharge of 60,000 gallons per day (gpd). All wastewater to be treated at the treatment facility will be residential wastewater or wastewater from

---

[5]See 310 Code Mass. Regs. §§ 15.000 et seq. (2006).

the elementary school. The plaintiffs' homes, which are not within the New Silver Beach area, will not be connected to the new treatment facility.

2. *Regulatory background.* "The Massachusetts Clean Water Act (Act), G. L. c. 21, §§ 26-53, is a comprehensive program for protection of the surface and groundwaters of the Commonwealth. General Laws c. 21, § 27 (6), vests authority in the department to adopt water quality standards and to prescribe effluent limitation[s], permit programs, and procedures for management and disposal of pollutants." *Friends & Fishers of the Edgartown Great Pond, Inc.* v. *Department of Envtl. Protection,* 446 Mass. 830, 837 (2006) (*Friends & Fishers*). Under the Act, the department may grant a permit for the discharge of pollutants into the waters of the Commonwealth or for the construction of a wastewater treatment facility "only if the discharge and the treatment [facility] . . . will, in [the department's] judgment, conform to effluent limitations specified in the permit, and will conform to regulations, receiving water standards and comprehensive plans adopted by the [department]." G. L. c. 21, § 43(5), as amended through St. 1973, c. 546, § 9. "The statutory purpose of the Act, expressed through its text, makes it clear that the department has the discretion to create regulations that will best preserve and also restore the quality of our waters." *Friends & Fishers,* 446 Mass. at 838.

The department regulates the discharge of pollutants into the groundwaters of the Commonwealth through its groundwater discharge permit program, 314 Code Mass. Regs. §§ 5.00 et seq. (1996). Under the program, the department is prohibited from issuing a groundwater discharge permit "when the discharge will cause or contribute to a condition in contravention of" the groundwater quality standards, 314 Code Mass. Regs. §§ 6.00 et seq. (1996),[6] or the surface water quality standards, 314 Code Mass. Regs. §§ 4.00 et seq. (1996). See 314 Code

---

[6]Title 314 Code Mass. Regs. §§ 6.00 et seq. was rescinded as unnecessary following the promulgation in March, 2009, of a revised version of 314 Code Mass. Regs. §§ 5.00 et seq. The revision does not govern the decision in this matter, as the commissioner ordered that the permit reflect the date of her decision, October 27, 2006, and required that the permit "may be modified and must be reissued at the completion of the five-year term, so that any revisions to the ground water quality standards or other Department regulations will be incorporated into subsequent permits."

Mass. Regs. § 5.06 (1997). Permits issued pursuant to the ground-water discharge permit program contain general conditions, which are applicable to all permits, and may contain special conditions, which are established by the department on a case-by-case basis. 314 Code Mass. Regs. § 5.10 (1996). Each permit contains "monitoring requirements to assure compliance with permit limitations and conditions." 314 Code Mass. Regs. § 5.10(6) (1996).

The groundwaters of the Commonwealth are grouped into three classifications: Class I, Class II, and Class III. See 314 Code Mass. Regs. § 6.03 (1996).[7] Section 6.06 of the ground-water quality standards provides limitations on various enumerated pollutants (or "parameters") applicable to each ground-water class. 314 Code Mass. Regs. § 6.06 (1996). A groundwater discharge permit issued by the department must contain "such conditions as the Department may deem necessary to insure compliance with the standards established in [§] 6.06." 314 Code Mass. Regs. § 6.07(1) (1996). The treatment facility at issue here will discharge effluent into Class I groundwaters, "fresh ground waters . . . designated as a source of potable water supply." 314 Code Mass. Regs. § 6.03(1) (1996). "The determination of compliance or non-compliance of . . . waste discharges with the requirements of [the groundwater quality standards] shall be made through tests or analytical determinations of ground water or effluent samples collected, transported and stored in such manner as is approved by the Department." 314 Code Mass. Regs. § 6.08(1) (1996). The plaintiffs argue that, in affirming the issuance of the permit to the town, the commissioner misapplied these regulations.

3. *Standard of review.* A party aggrieved by the commissioner's final decision may appeal to the Superior Court pursuant to G. L. c. 30A, § 14. Judicial review is confined to the administrative record. G. L. c. 30A, § 14(5). The burden is on the appealing

[7]Class I groundwaters are "fresh ground waters . . . designated as a source of potable water supply." 314 Code Mass. Regs. § 6.03(1) (1996).

Class II groundwaters are "saline waters . . . designated as a source of potable mineral waters, for conversion to fresh potable waters, or as raw material for the manufacture of sodium chloride or its derivatives or similar products." 314 Code Mass. Regs. § 6.03(2) (1996).

Class III groundwaters are "fresh or saline waters . . . designated for uses other than as a source of potable water supply." 314 Code Mass. Regs. § 6.03(3) (1996).

party to demonstrate the invalidity of the commissioner's decision. *Merisme* v. *Board of Appeals on Motor Vehicle Liab. Policies & Bonds*, 27 Mass. App. Ct. 470, 474 (1989).

We review the commissioner's decision to determine whether it was "unsupported by substantial evidence, arbitrary and capricious, or otherwise based on an error of law." *Friends & Fishers*, 446 Mass. at 836. "Substantial evidence [is] such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1(6). The applicable standard of review is "highly deferential to the agency" and requires the reviewing court to accord "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." *Friends & Fishers*, 446 Mass. at 836-837, quoting from *Flint* v. *Commissioner of Pub. Welfare*, 412 Mass. 416, 420 (1992).

"We give deference to the decision of an agency interpreting its own regulations . . . [and] do not intrude lightly within the agency's area of expertise, as long as the regulations are interpreted with reference to their purpose and to the purpose and design of the controlling statute." *Friends & Fishers*, *supra* at 837 (quotations and citations omitted).

4. *Reasonable margin of safety*. The plaintiffs argue that the department has failed to provide a reasonable margin of safety to account for any lack of knowledge regarding the impact of the treatment facility's discharge on the quality of the groundwaters and on the plaintiffs' wells.[8] The minimum acceptable separation distance between private wells and the leaching facility of a small treatment plant with land disposal is one hundred

---

[8]The regulations provide: "*Establishment of Discharge Limits*. In regulating discharges of pollutants to ground waters of the Commonwealth, the Department shall limit or prohibit such discharges to insure that the quality standards of the receiving waters will be maintained or attained. The determination by the Department of the applicable level of treatment for an individual discharger will be made in the establishment of discharge limits in the individual ground water discharge permit. In establishing effluent limitations in the individual permits, the Department must consider natural background conditions, must protect existing adjacent and downgradient uses and must not interfere with the maintenance and attainment of beneficial uses in adjacent and downgradient waters. *Toward this end, the Department may provide a reasonable margin of safety to account for any lack of knowledge concerning the relationship between the pollutants being discharged and their impact on the quality of the ground waters*" (emphasis added). 314 Code Mass. Regs. § 6.07(2) (1996).

feet. Department of Environmental Protection, Guidelines for the Design, Construction, Operation and Maintenance of Small Sewage Treatment Facilities with Land Disposal 42 (2d draft Jan. 1988).[9] The private well closest to the proposed leach field is more than 400 feet from the leach field; the commissioner thus concluded reasonably that the plaintiffs had not presented sufficient evidence to show that their wells would be polluted by the treatment facility's discharge. The department need not establish permit conditions based on the most pessimistic projection of pollution presented by the plaintiffs. See *Friends & Fishers*, 446 Mass. at 840-841.

5. *Monitoring.* The plaintiffs also argue that the permit should not have been issued without a requirement that the town monitor the treatment facility's discharge for all applicable parameters listed within the regulations, and for toxic chemicals used in ordinary households. We disagree. The Legislature "has chosen to put into the hands of an expert administrative agency the decision making regarding complex issues of environmental . . . science," *Friends & Fishers, supra* at 838, quoting from *Brookline* v. *Commissioner of the Dept. of Envtl. Quality Engr.,* 398 Mass. 404, 413 (1986), and has allowed the agency considerable discretion in determining monitoring of applicable parameters in order to carry out its duty to insure that a waste discharge will conform to the requirements of the groundwater quality standards. See *Friends & Fishers, supra.* The regulations do not explicitly require such monitoring. The commissioner's determination that "[t]he regulations governing monitoring of ground water discharges at 314 C[ode] M[ass.] R[egs. §] 5.10(6) [1996] and 314 C[ode] M[ass.] R[egs. §] 6.08 [1996] do not require monitoring of each parameter" is reasonable in light of the regulations' purpose and the purpose and design of the Act.

Based on its determination of the parameters of concern for sanitary wastewater from residential uses and an elementary school, the department issued to the town a permit that includes conditions required to maintain the quality of the receiving groundwaters. In accordance with the regulations, the permit contains a total nitrogen discharge limit of ten milligrams per

---

[9] "Small" is defined in the Guidelines, *supra,* as treatment of sewage flows between 15,000 and 250,000 gpd. The permit in the instant matter allows a maximum flow of 60,000 gpd.

liter (mg/l) and a nitrate-nitrogen discharge limit of 10 mg/l. It requires daily, monthly, or annual analysis, at the pump chamber to the leach field, of the effluent that is discharged into the ground, including monthly analysis of nitrogen content and annual analysis of volatile organic compounds. It also requires installation of monitoring wells (one upgradient and two downgradient) in order to monitor water quality, including quarterly analysis of nitrogen content and annual analysis of volatile organic compounds. The permit comports with the department's statutory mandate to protect the groundwaters of the Commonwealth.

The plaintiffs have raised the possibility that toxic household chemicals may enter the treatment facility's discharge, disrupt the facility's treatment system, and cause pollution of their wells, and on that basis argue that the department must require the town to monitor the treatment facility's discharge for toxic chemicals used in ordinary households. Based upon our review of the record, the commissioner reasonably could have determined that the plaintiffs failed to present sufficient evidence to show that such toxins were likely to be present in concentrations that pose a threat to the quality of the receiving groundwaters. The regulations do not require the department to establish permit conditions based on the plaintiffs' speculative concerns. See *Friends & Fishers*, 446 Mass. at 840 (plaintiffs' argument that the department must establish permit limitations based on the most pessimistic projection of pollution failed).

6. *Burden of proof.* The plaintiffs argue that, contrary to the commissioner's determination, in the course of the agency proceedings, they raised a serious issue of risk that toxic chemicals used in ordinary households would enter the treatment facility's discharge and cause pollution of their wells, and that the town did not meet its burden to show that the treatment facility's discharge was safe. "[O]nce a serious issue of risk has been raised by an opponent [of a proposed facility], the applicant bears the burden of proving that the facility will be safe with regard to that issue." *Brookline* v. *Commissioner of the Dept. of Envtl. Quality Engr.*, 398 Mass. at 412. The commissioner reasonably concluded that the plaintiffs' evidence was insufficient to shift the burden of proof because the plaintiffs failed to offer sufficient evidence to show that toxic household chemicals were likely to be present in concentrations that pose a threat to the quality of the receiving

groundwaters. The town was not required to respond to the plaintiffs' speculative and unsupported assertions. See *id.* at 412-413.

7. *Surface water quality standards.* The plaintiffs next contend that the treatment facility's discharge "will cause or contribute to a condition in contravention of" the surface water quality standards, thus violating the groundwater discharge permit regulations. See 314 Code Mass. Regs. § 5.06 (1997). They argue that the department did not adequately consider the water quality of the nearby vernal pool and marsh because it did not require the town to analyze the existing "background levels" of any pollutants in those surface waters. Substantial evidence in the record supports the commissioner's decision to uphold the issuance of the permit.

Although the groundwater discharge permit program draws upon both the groundwater quality standards and the surface water quality standards in appropriate cases, most surface water quality standards do not apply to a permit for discharges into groundwater. *Friends & Fishers*, 446 Mass. at 842. Because the treatment facility will not discharge effluent directly into either the vernal pool or the marsh, "the only relevant surface water quality standards are those dealing with the nitrogen loading and eutrophication[10] of [surface waters] from nonpoint source discharges into groundwater, 314 Code Mass. Regs. § 4.05(5)(c) [1997], and, to some extent, the antidegradation provisions of the surface water quality standards, 314 Code Mass. Regs. § 4.04(5) [1997]." *Ibid.*

The commissioner's decision to grant the permit is supported by evidence in the record showing that the treatment facility will lower the risk of eutrophication in the vernal pool and marsh. Amy Lowell, the wastewater superintendent for the town, stated, in written testimony submitted to the department, that the elementary school and approximately 210 New Silver Beach homes are currently discharging untreated wastewater into the ground. The treatment facility would reduce the impact of wastewater upon surface waters because the wastewater from the elementary school and New Silver Beach homes would be subject

---

[10] "Eutrophication is the process by which a pond or lake becomes overloaded with mineral and organic nutrients. This causes the proliferation of certain plant life, like algae, that reduces the amount of dissolved oxygen in the water and often causes the extinction of other organisms." *Friends & Fishers*, 446 Mass. at 833 n.6.

to nitrogen removal at the treatment facility before it is discharged into the ground.

In addition, the commissioner considered testimony from Brian Dudley, the department staff engineer who reviewed and signed the permit. He averred that the permit's 10 mg/l limit on nitrogen loading into the ground is more stringent than the limit provided in the regulations for discharge into Class I groundwaters because the 10 mg/l limit in the regulations is required only for wastewater flows in excess of 150,000 gpd,[11] whereas the treatment facility's flow limit is 60,000 gpd.

At the hearing before the administrative magistrate, the plaintiffs argued that, because of the direction of groundwater flow, nutrients from the treatment facility's discharge would flow towards and mix with the water in the vernal pool and marsh, and would degrade the quality of these surface waters. The administrative magistrate and the commissioner could reasonably conclude that the plaintiffs failed to present sufficient evidence to support this claim. Thus, the department's decision to uphold the issuance of the permit to the town, without requiring the town to conduct analytical tests of the water within the vernal pool and marsh, is supported by substantial evidence.

8. *Magistrate's findings.* The plaintiffs argue that the commissioner improperly rejected that part of the administrative magistrate's recommended decision implying that the discharge from the treatment facility would degrade the receiving groundwater from Class I to Class III. They argue that where there is doubt about the accuracy of the administrative magistrate's determination, the commissioner is required to remand the case to the administrative magistrate for additional findings or the taking of additional evidence. As we read the recommended decision, it contained no such implication, and in any event, there was no error.

"Recommended decisions should include findings of fact, conclusions of law and recommendations on issues necessary to the decision." 310 Code Mass. Regs. § 1.01(14)(a) (2004). "A final decision may adopt, modify, or reject a recommended decision, with a statement of reasons." 310 Code Mass. Regs.

[11]See 314 Code Mass. Regs. § 5.10(3)(c) (1996).

§ 1.01(14)(b) (2004). In his recommended decision, the administrative magistrate concluded that the department could issue a groundwater discharge permit to the town for the treatment facility project even if the discharge from the treatment facility would degrade groundwater at the site. In the final decision, the commissioner stated:

> "While I concur with the Recommended Decision that the regulations allow the reclassification of ground water from Class I to Class III, the Town has not applied for, nor has the Department given any indication it would approve, a reclassification to accommodate [the treatment facility] project. . . . In fact, the permit contains effluent limitations adequate to meet Class I standards . . . . I reject the implication that a Class III designation might be necessary to support the issuance of this permit."

The commissioner's statement of reasons was sufficient.

9. *Terry Bauer's testimony.* Finally, the plaintiffs argue that both the administrative magistrate and the commissioner failed to give due weight to the testimony of their expert, Terry Bauer,[12] who opined that discharge from the treatment facility would harm nearby wetlands. At the agency hearing, Bauer stated that nitrogen and phosphorus from the treatment facility's discharge would cause eutrophication in the vernal pool and the marsh. There is no merit to the plaintiffs' contention that the administrative magistrate impermissibly excluded Bauer's testimony. Rather, the administrative magistrate considered Bauer's testimony[13] and determined that it was not credible. Specifically, the administrative magistrate found that the plaintiffs "did not establish that Bauer's training as a geologist or his work experience qualify him to provide expert opinion on how the concen-

---

[12]Bauer is a certified professional geologist.

[13]In a November 29, 2005, provisional ruling, the administrative magistrate struck portions of Bauer's prefiled, written testimony, in which Bauer expressed his opinion that effluent from the treatment facility would cause eutrophication in the vernal pool and marsh. However, in a subsequent posthearing ruling confirming parts of the November 29 ruling, the administrative magistrate did not confirm his ruling striking the portions of Bauer's testimony regarding eutrophication. In addition, the administrative magistrate discussed the credibility of Bauer's testimony in his recommended decision, clearly suggesting that he had considered Bauer's testimony.

trations of nitrogen and phosphorus allowed by the discharge permit will affect the vernal pool and marsh. Accordingly, his testimony on this point is entitled to no weight."

In assessing the credibility of Bauer's testimony, the administrative magistrate properly took into account Bauer's training and expertise. See *Letch* v. *Daniels*, 401 Mass. 65, 69 (1987), citing *Commonwealth* v. *Schulze*, 389 Mass. 735, 740 (1983) (the extent of the training and experience of an expert witness appropriately bears on the weight that should be accorded his testimony). The administrative magistrate's decision to give "no weight" to Bauer's testimony as to eutrophication was based on an explicit and objectively adequate reason. See *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 470-471 (1981), quoting from Jaffe, Judicial Control of Administrative Action 598, 607 (1965) ("[E]vidence of a party having the burden of proof may not be disbelieved without an explicit and objectively adequate reason"). Because the plaintiffs failed to meet their burden to prove that nutrients from the treatment facility's discharge would cause eutrophication in the vernal pool and marsh,[14] the commissioner properly resolved the issue in favor of the defendants, even in the absence of affirmative evidence showing that the treatment facility's discharge would not cause eutrophication.[15]

*Conclusion.* For the reasons stated above, we affirm the judgment of the Superior Court.

*So ordered.*

---

[14]The administrative magistrate determined, and the commissioner implicitly agreed, that as there was no inherent reason to assume that any increase in nutrients reaching the vernal pool and marsh would inevitably lead to eutrophication, the plaintiffs bore the burden to show that, at the concentrations allowed in the permit, nutrients in the treatment facility's discharge would cause eutrophication.

[15]See Brodin and Avery, Handbook of Massachusetts Evidence § 3.1, at 60 (8th ed. 2007) ("If at the close of the evidence the fact finder determines that a fact has not been proven to the required level of certainty, it must decide the issue against the burdened party").