# DECISIONS

## OF THE

## APPEALS COURT

### OF

## MASSACHUSETTS

---

MASLAB LIQUIDATION TRUST *vs.* COMMONWEALTH.

No. 02-P-939.

Suffolk. November 5, 2003. - April 26, 2004.

Present: GELINAS, KANTROWITZ, & COHEN, JJ.

*Hazardous Waste. Administrative Law,* Judicial review, Agency's interpretation of regulation, Regulations. *Statute,* Construction. *Words,* "Facility," "License."

Discussion of the statutory and regulatory scheme concerning the Department of Environmental Protection's governance of hazardous waste storage, disposal, and treatment facilities and financial responsibility requirements for licensees. [8-10]

In a civil action brought by the assignee of a reversionary interest of a certain Department of Environmental Protection (DEP) licensee in an insolvency trust fund (trust) established to cover third parties' damages claims arising from the licensee's operation of a hazardous waste storage, disposal, and treatment facility, the judge properly denied the assignee's motion to disburse the trust's funds, where the agreement establishing the trust secured not only claims for damages resulting from hazardous waste operations within the licensed portion of the licensee's property, but also claims for damages arising from hazardous waste illegally present outside the

2          61 Mass. App. Ct. 1 (2004)'

Maslab Liquidation Trust *v*. Commonwealth.

licensed portion of the licensee's property [10-12]; likewise, DEP did not act improperly in refusing to certify closure of the relevant facility while it used a closure trust fund to clean up hazardous waste found throughout the property, as such use was consistent with the terms of the closure trust agreement [12-13].

CIVIL ACTION commenced in the Superior Court Department on June 7, 2000.

A motion for disbursement of funds was heard by *Thomas E. Connolly*, J.

*Bernard W. Costich*, of Connecticut (*William D. Gillis, Jr.*, with him) for the plaintiff.

*Siu Tip Lam*, Assistant Attorney General, for the Commonwealth.

COHEN, J. Maslab Liquidation Trust (Maslab) appeals from an order denying its motion for disbursement of monies held in an insolvency trust fund (fund) established, pursuant to G. L. c. 21C and implementing regulations, by Hampden Color & Chemical Co., Inc. (HCC), for the purpose of covering third-party bodily injury and property damage claims arising from HCC's operation of a hazardous waste storage, disposal, and treatment facility.[1] Maslab pursues this claim in its capacity as one of two assignees of HCC's reversionary interest in the fund.[2]

It is Maslab's position that the fund is only available to compensate claims for damages caused by hazardous waste located within the areas of HCC's property covered by its

[1]Maslab's notice of appeal states that its appeal is from the judge's April 29, 2002, order denying Maslab's motion for reconsideration of the judge's earlier order denying the joint motion to disburse funds. While the Commonwealth argues that Maslab has preserved for our review only the narrow issues raised in the motion for reconsideration, we elect to consider the propriety of the disposition of the underlying motion to disburse funds, as the issue has been fully briefed by the parties and is a matter affecting the public interest. See generally Mass.R.A.P. 3(c), as appearing in 430 Mass. 1602 (1999); *Pryor* v. *Holiday Inns, Inc.*, 401 Mass. 506, 509-510 (1988).

[2]A second plaintiff, KF Chemical Company, Ltd. (KF Chemical), is also an assignee of HCC's interest in the fund joined in the motion for disbursement. KF Chemical has not appealed from the judge's order.

hazardous waste license[3]; that all such claims are now time-barred, because operations in the licensed areas ceased in 1994; and that, therefore, there is nothing to prevent the fund from reverting to HCC, and hence to Maslab, as assignee. In the Superior Court, the Commonwealth, on behalf of the Department of Environmental Protection (DEP) — the fund's sole beneficiary — successfully opposed the requested disbursement on the grounds that, in violation of law, HCC stored considerable amounts of hazardous waste in unlicensed areas of its property, and, because this condition has not been remediated, there exists a continued risk of third-party claims against the fund.

The outcome of this appeal turns upon the proper interpretation of the scope of the agreement establishing the insolvency trust (agreement). We are asked to decide whether, as Maslab contends, the agreement does not extend to claims that may arise from hazardous waste that was not located or generated in the specific area that was covered by HCC's license, or whether, as the Commonwealth argues, the agreement must be read to secure not only claims for damages resulting from hazardous waste operations within the licensed portion of HCC's property, but also claims for damages that may arise from hazardous waste illegally present elsewhere on the property.

We conclude that Maslab's narrow interpretation of the agreement is inconsistent with the governing statute and regulations and not in keeping with the overriding legislative purpose of requiring owners of hazardous waste facilities to provide adequate security for the protection of the public health and safety, and the environment, from the potential hazards posed by their facilities. Because it remains possible for third-party claims to arise from hazardous waste present in unlicensed areas of HCC's property, we affirm the Superior Court order denying Maslab's motion to disburse the fund.

1. *Background.* We take the undisputed facts from the affidavits and supporting documentation submitted by the parties in connection with the joint motion for disbursement. According

[3]We refer to the site in question as HCC's property, irrespective of time frame, even though the property was taken for back taxes by the city of Springfield in 2001.

to the affidavit of William Sirull,[4] filed on behalf of DEP, HCC first obtained a license to operate a hazardous waste treatment, storage, and disposal facility at HCC's property at 126 Memorial Drive in Springfield in 1979. The property included an office, a distillation treatment process room, a drum storage room, a warehouse, a laboratory, and an area for chemical transfer, packaging, and drum wash. The license permitted HCC to engage in hazardous waste operations in only two areas: the distillation treatment process room and the drum storage room. At the same time, HCC also engaged in permissible, nonregulated chemical handling operations on its property that did not require a hazardous waste license. In 1986, HCC was issued a new Hazardous Waste Part B License, which allowed HCC to manage chlorinated solvent waste, again limited to the distillation treatment room and the drum storage room at the Springfield property.

In accordance with the controlling hazardous waste management regulations, 310 Code Mass. Regs. §§ 30.000 et seq., HCC arranged to provide financial security for third-party damages and for costs incurred in the event the facility closed. In 1992, pursuant to 310 Code Mass. Regs. § 30.910(1), (2) (1990),[5] HCC established a letter of credit, and a standby trust (referred to by the parties as the "insolvency trust") in case the letter of credit expired, to provide financial assurance for third-party claims arising from operation of the facility.[6] In 1984, pursuant to 310 Code Mass. Regs. § 30.904 (1983), HCC had also established a separate letter of credit to satisfy the requirement of financial assurance to fund the closure of the facility, as well as a closure trust to be funded from the letter of credit in the event that HCC failed to obtain an extension of the letter of credit before it expired.

---

[4]William Sirull's affidavit identifies him as the acting chief of the DEP's enforcement support branch of the business compliance division within the bureau of waste prevention.

[5]Citations to regulations in this opinion are to versions that were in effect at the time the relevant agreements were entered into. However, it does not appear that subsequent changes to the regulations would affect our analysis in any material respect. There is also no dispute between the parties as to the controlling regulatory language.

[6]HCC thereby updated its 1986 insolvency trust fund.

During the period of its licensure, HCC informed DEP of two hazardous waste spills at the property. In 1984, a release of 500 to 700 gallons of chlorinated solvents occurred at the site during drum filling. As a consequence, wastes were released into the soil and groundwater at the property, thereby affecting the storm drainage system and a nearby brook. In 1989, HCC reported another 600 gallons of chlorinated solvents spilled in the course of filling a tanker truck, again affecting soil, groundwater, and the brook. HCC initiated remedial measures, but failed to complete the cleanup of these spills.

According to the affidavit of HCC's president, Philip E. Bendheim, HCC received its last shipment of hazardous materials at the Springfield property in 1993. Nevertheless, such materials remained, and still remain, present on the property. Of particular significance here, commencing at least as early as 1994, and in violation of G. L. c. 21C, § 5,[7] HCC began to store significant amounts of hazardous waste in areas of its property that were not covered by its license, including the laboratory and warehouse, and in outdoor storage tanks. Moreover, when HCC's license expired in 1998, it continued to store hazardous waste not only in the two rooms previously permitted by the license, but also in other areas of the property.

In 1999, HCC failed to obtain an extension of its closure letter of credit, prompting DEP to draw on the letter of credit in the amount of $35,000 to fund the closure trust. HCC also failed to obtain an extension of its insolvency letter of credit, causing DEP to draw on that letter of credit in the amount of $275,000 to fund the insolvency trust fund. Thereafter, in June, 1999, DEP sent HCC two notices of noncompliance, notifying HCC of its responsibility to effect closure of the treatment and storage areas and to remove the hazardous waste it had been storing impermissibly on unlicensed parts of the property. HCC failed to undertake these measures. As a result, DEP itself conducted certain closure activities, depleting the closure trust

---

[7]That section provides, in pertinent part: "No person shall collect, transport, store, dispose of, treat, use or transport hazardous waste in a manner which could endanger human health, safety or welfare, or the environment, or in a manner inconsistent with any provision of this chapter, or of any regulation standard, license, or order issued pursuant to this chapter." G. L. c. 21C, § 5.

fund to do so.[8] The sum of $298,892 remained in the insolvency trust fund as of October 31, 2001, to secure third-party claims.

Maslab's connection with HCC's insolvency trust fund originated when it became a judgment creditor of HCC. In 1993, Maslab's predecessor, Balsam Environmental Consultants, Inc. (Balsam), sued HCC in Superior Court to collect unpaid environmental consulting fees, and in 1995 obtained a judgment against HCC in the amount of approximately $385,000.[9] In 2000, another HCC creditor, KF Chemical Company, Ltd. (KF Chemical), filed a separate action in Superior Court against HCC to collect on a promissory note. As part of KF Chemical's proceedings, HCC and Fleet National Bank, as trustee of the insolvency trust fund, were preliminarily enjoined from disposing of the fund monies. Maslab intervened in the KF Chemical action and obtained a modification in the preliminary injunction, which provided that the fund could be distributed only by court order. The KF Chemical and Maslab actions were consolidated. KF Chemical, Maslab, and HCC eventually entered into a settlement agreement[10] whereby HCC, among other things, assigned its reversionary interest in the fund to KF Chemical and Maslab (jointly and severally).

On February 20, 2002, KF Chemical, Maslab, and HCC filed a joint motion for an order directing disbursement of the fund, based on their contention that "the time frame in which claims could be made to the funds has expired." The Commonwealth, on behalf of DEP, was allowed to intervene as a defendant, and filed an opposition to the joint motion for disbursement. At the hearing on Maslab's motion, DEP represented, and it was not disputed, that more than 200 containers of hazardous waste were still being stored at the property.

[8]As of October 31, 2001, only $226 remained in the closure trust fund. It was estimated by DEP that an additional $40,000 would be needed to remove hazardous waste containers from the property and that additional monies would be required to complete decontamination.

[9]Between 1989 and 1994, Balsam performed response actions for HCC in connection with the two releases of contaminants on the Springfield property. Maslab was substituted for Balsam as the plaintiff in the Superior Court action in September, 1995.

[10]As part of the settlement, HCC agreed to the entry of a judgment in favor of KF Chemical in the amount of $498,351.79.

2. *Interpretation of the insolvency trust agreement.* The insolvency trust agreement, dated April 1, 1992, identifies HCC as the grantor, Shawmut Bank, N.A. (now Fleet National Bank), as the trustee, and DEP as the beneficiary. Critical for Maslab's purposes as assignee of HCC's interest in the trust, the agreement provides that, upon termination, "all remaining trust property, less final trust administration expenses, shall be delivered to the Grantor."[11] During its existence, however, DEP is the sole beneficiary, serving as the conduit for paying third-party claims for "bodily injury and property damage caused by each sudden accidental occurrence and/or each nonsudden accidental occurrence *arising from operation of the facility covered by this Agreement*" (emphasis supplied).[12] The nub of the parties' dispute is whether "the facility covered by this Agreement" refers to HCC's Springfield property as a whole, or only to the two rooms covered by the license.

As we consider the language and underlying intent of the agreement, and, more particularly, the meaning of the phrase "the facility covered by this Agreement," we must bear in mind that the agreement's terms were mandated by regulation.

---

[11]The current applicable regulation, 310 Code Mass. Regs. § 30.910(1)(c)(9) (1994), generally provides that DEP may agree to terminate the insolvency trust if DEP is satisfied that the owner has substituted other financial assurance, or when DEP certifies closure of the facility, pursuant to 310 Code Mass. Regs. §§ 30.500 et seq. In that instance, the remaining funds would revert to the facility "only to the extent sufficient funds are available to pay outstanding claims or other obligations that are unpaid or unresolved." 310 Code Mass. Regs. § 30.910(1)(c)(9)(b).

[12]Although the facility covered by the agreement was required to be described in an attached Schedule A, no Schedule A to the insolvency trust agreement is included in the record. A document entitled "Standby Trust Agreement: Schedule A" is attached to the closure trust agreement submitted by DEP in its supplemental appendix. Maslab claims that this document is not the original Schedule A, because the April 11, 1997, date is inconsistent with the 1984 date of the closure trust agreement. In any event, the document contained in the supplemental appendix does little to inform our decision. It contains no particulars beyond what was required to be included by the regulations: the facility's United States Enviromental Protection Agency identification number, and the name and address of the facility, here HCC, followed by the Springfield address. See 310 Code Mass. Regs. § 30.910(3)(a) (1987) (Section 2, "Identification of Facilities"). Thus, even if its authenticity were unquestioned, and even if it bore directly on the insolvency trust, it would shed little light as to what areas or activities were intended to be covered by the agreement.

Specifically, 310 Code Mass. Regs. § 30.910(1)(c)(3) (1990), applicable to standby trusts established with a letter of credit under 310 Code Mass. Regs. § 30.910(1)(d)(7) (1990), required that the language of the insolvency trust agreement be "identical" to the form of agreement set out at 310 Code Mass. Regs. § 30.910(3)(a) (1987). Thus, DEP, in promulgating the regulations, dictated the precise wording of the agreement and expressly required that it be followed without modification. Accordingly, our interpretation of the scope of the agreement is governed by the same principles that we would apply to the interpretation of the regulations themselves, rather than by traditional contractual analysis. Cf. *Children's Hosp. Corp.* v. *Rate Setting Commn.*, 410 Mass. 66, 68-69 (1991); *Bertocchi's Case*, 58 Mass. App. Ct. 561, 565 (2003). We must consider the agreement with reference to the purpose and design of the controlling statute and regulations, see *Goddard Memorial Hosp.* v. *Rate Setting Commn.*, 403 Mass. 736, 743-744 (1989); and we also must give appropriate deference to DEP's own interpretation of its regulations. See *Brookline* v. *Commissioner of the Dept. of Envtl. Quality Engr.*, 398 Mass. 404, 414 (1986); *TBI, Inc.* v. *Board of Health of N. Andover*, 431 Mass. 9, 17 (2000).

The governing statute grants DEP broad authority to regulate treatment, storage, and disposal facilities. General Laws c. 21C, § 4, sets out the powers and duties of the DEP. Among other things, "[t]he [DEP] shall be responsible for the supervision of the maintenance and operation of all facilities in order to ensure the public health, safety, welfare and the environment." *Ibid.* Section 4 goes on to provide, in relevant part, as follows:

> "The [DEP] shall require that a licensee obtain and maintain in effect a contract of liability insurance, a surety bond or other evidence of financial responsibility in favor of the commonwealth sufficient to assure financial responsibility in the event of damages resulting from accidents, negligence, misconduct, or malfunctioning in the construction, maintenance and operation of a facility, or from any other circumstances reasonably foreseeable occurring during or after construction or in the course of the

maintenance and operation of hazardous waste facilities."

*Ibid.*, as amended by St. 1980, c. 508, § 2. As indicated, the financial security is intended to cover a broad range of potential mishaps, expressly including those resulting from misconduct or other activities in the operation of the facility from which damages might be reasonably foreseen. Based on the clear language of the statute, we think HCC's operation of the facility in a manner beyond the permissible scope of the license is properly characterized as "misconduct" under § 4. See generally *Cambridge* v. *Cambridge Police Patrol Officers Assn.*, 58 Mass. App. Ct. 522, 525 (2003) ("where a 'statute does not effectively define [a word] . . . the Legislature should be supposed to have adopted the common meaning of the word, as assisted by a consideration of the historical origins of the enactment' "), quoting from *Jancy* v. *School Comm. of Everett*, 421 Mass. 482, 490-491 (1995). Indeed, there can be little doubt that such misconduct has the potential to create precisely the type of injury to the surrounding community and environment that the statute was intended to redress.[13]

General Laws c. 21C, § 4, also authorizes the DEP to adopt regulations to implement the provisions of the chapter. Among the regulations adopted to further the security provision quoted above were 310 Code Mass. Regs. §§ 30.900 et seq. In keeping with the broad sweep of the statutory security provisions of c. 21C, § 4, the regulations similarly require: "An owner or operator of a hazardous waste treatment, storage, or disposal facility, or a group of such facilities in Massachusetts, shall demonstrate assurance of financial responsibility for bodily injury and property damage to third parties caused by each sudden accidental occurrence arising from operation of the

---

[13]We are not persuaded by Maslab's reliance on the prohibitions against unlicensed activities elsewhere in the statute as somehow limiting the scope of the fund's protection. While G. L. c. 21C, § 5, prohibits any person from, among other things, storing, treating, or disposing of hazardous waste without a valid license, nothing in § 5 restricts the availability of the fund to damages arising solely from the owner's licensed operations. The same is true of c. 21C, § 7, which prohibits the operation of a facility in a manner inconsistent with the terms established by the DEP in the license. Again, we think operation of a facility in a manner inconsistent with the license constitutes a form of misconduct for which the Legislature intended financial protection under § 4.

facility(ies)." 310 Code Mass. Regs. § 30.908(1) (1987). The same assurances are required to cover nonsudden accidental occurrences, under 310 Code Mass. Regs. § 30.908(2) (1987).[14]

Against this statutory and regulatory backdrop, we now turn to the interpretation of the disputed language contained in the regulation and incorporated into the agreement, that is, "the facility covered by this Agreement." As previously noted, see note 12, *supra*, the regulations require that the agreement include, under "Identification of Facilities," an attached Schedule A, listing for each facility "the EPA identification number,[15] name, and address for which financial responsibility is demonstrated by this Agreement," but further identification of the areas or activities permitted in the applicable license is not required. See 310 Code Mass. Regs. § 30.910(3)(a) (1987). On the other hand, the regulations themselves define a "facility" as follows:

> "Facility means a site or works for the storage, treatment, dewatering, refining, incineration, reclamation, stabilization, solidification, disposal, or other processes where a hazardous waste is or will be stored, treated, disposed of, or used . . . . Without limiting the generality of the foregoing, a facility may consist of several treatment, storage, or disposal operating units, and shall include all land, structures, and other appurtenances and improvements which are directly related to the storage, treatment, use or disposal operations."

310 Code Mass. Regs. § 30.010 (1990). Thus, "facility" is defined broadly, in descriptive terms, by the presence of hazardous waste and the activities conducted there. Entirely absent is

---

[14]The procedures set forth in 310 Code Mass. Regs. § 30.910(1) refer to financial security for third-party claims resulting from sudden accidental occurrences, while those set forth in 310 Code Mass. Regs. § 30.910(2) set out the same procedures to cover nonsudden accidental occurrences. As the parties have done in their briefs, we shall refer only to 310 Code Mass. Regs. § 30.910(1), as the relevant requirements are the same.

[15]EPA means the United States Environmental Protection Agency. The EPA identification number is defined by the regulations as "the number assigned to each generator, transporter, user, and treatment, storage, or disposal facility."

any reference to a license.[16] It is also significant that a "facility" is described in the definition as a "site or works." A site is referred to as "the same or geographically contiguous property in single ownership," 310 Code Mass. Regs. § 30.010 (1989),[17] again without reference to a license. Nor does the definition of the term "license" delineate a "facility." "License" is defined in the regulations as "the written approval, on a form prescribed by the [DEP], issued pursuant to [G. L. c.] 21C, to collect, transport, treat, store, use, or dispose of hazardous waste." *Ibid.*

Taken together, then, the regulations define a "facility" by the presence of hazardous wastes and processes occurring on the property, rather than by the terms of the written approval obtained by way of a license for that facility. See generally *Knapp Shoes, Inc.* v. *Sylvania Shoe Mfg. Corp.*, 418 Mass. 737, 744 (1994) ("Language in a regulation, like language in a statute . . . 'must be considered in light of the other words surrounding [it]' . . . and its scope and meaning must be determined by reference to context"), quoting from *Commonwealth* v. *Brooks*, 366 Mass. 423, 428 (1974). See also *The St. Paul Cos.* v. *TIG Premier Ins. Co.*, 58 Mass. App. Ct. 650, 657 (2003) ("a statute should be read as a whole to produce an internal consistency"), quoting from *Telesetsky* v. *Wight*, 395 Mass. 868, 873 (1985).

In short, there is ample support for the Commonwealth's position that the activities and locations for which security is required are not limited to those set out in the license.[18] The statute gives DEP broad authority to regulate licensees and to require them to provide security for the activities at their hazardous waste facilities, without limiting that safeguard solely to damages arising within the parameters of the license.[19]

We therefore hold that the fund in question was intended to

___

[16]This stands in contrast, for example, to the definition of a "publicly owned treatment works," as "a municipal wastewater treatment facility which has a currently valid permit issued pursuant to [G. L. c. 21, § 43]." 310 Code Mass. Regs. § 30.010 (1989). In that context, unlike the present one, the existence of a permit is a defined attribute of being a facility.

[17]There is no separate definition of "works" in the definitions section of the regulations.

[18]We decline to rely on a draft administrative consent order proffered by Maslab as indicative of the DEP's interpretation of the intended application of the insolvency trust agreement.

[19]In this respect, the Commonwealth points out that certain Federal courts have required hazardous waste facilities, regulated under Federal or State

compensate third parties for damages arising from HCC's storage of hazardous waste throughout its Springfield property. Because hazardous waste remained on the property at the time Maslab sought disbursement, and there remained the potential for third-party claims for damages caused by those wastes, the judge correctly denied Maslab's motion to disburse the fund.[20]

3. *Closure of the facility.* On a related matter, Maslab complains that DEP should have certified closure of the facility or, failing that, the judge should have deemed the facility closed, even though remediation of nonlicensed areas of HCC's property was not complete. This is significant to Maslab because closure of the facility generally is necessary under the regulations before the insolvency trust fund can revert to HCC. See 310 Code Mass. Regs. § 30.910(1)(c)(9)(b) (1994). Closure requires, among other things, the removal of all hazardous waste and residue and the decontamination or disposal of all equipment, structures, and soils from the facility. See 310 Code Mass. Regs. §§ 30.585, 30.587 (1988).

Maslab argues that the closure trust fund contained sufficient money to have covered the clean-up of the licensed areas, but that DEP improperly spent such funds to clean up areas not covered by the. license, thereby depleting that fund before even the licensed areas were fully remediated. According to Maslab, had DEP spent the closure trust fund solely on remediation of the licensed areas, clean-up of the licensed areas would have been completed by now, and the facility could be certified as closed. Because, according to Maslab, the closure trust fund

programs similar to the Code of Massachusetts Regulations, to maintain financial assurances even when those facility owners failed to obtain the requisite license or permit. See, e.g., *United States* v. *Ekco Housewares, Inc.,* 62 F.3d 806, 812-813 (6th Cir. 1995) (pursuant to Federal environmental regulations, an owner/operator of a hazardous waste facility must demonstrate financial responsibility for third-party claims pending closure, whether or not it had obtained the requisite permit or filed an application for interim status); *United States* v. *Power Engr. Co.,* 191 F.3d 1224, 1232-1233 (10th Cir. 1999) (financial assurance provisions of Colorado regulations deemed to apply to all owners and operators of hazardous waste facilities and were not limited to permit holders).

[20]Maslab additionally argues that the judge erred in not permitting Maslab to provide substitute financial assurance in the form of a "claims made" insurance policy to cover third-party claims. Maslab cites no authority that required the judge to do so.

was wrongfully depleted, and DEP refuses to certify closure because more remedial work remains both within the formerly licensed areas and throughout the Springfield property, Maslab argues that the judge should have deemed the facility closed. From DEP's perspective, however, the Springfield property cannot properly be deemed closed until all the hazardous waste has been removed from the entire site and remediation has been completed throughout the property.

Our resolution of Maslab's claim for disbursement of the insolvency trust fund disposes of this issue as well. DEP's use of the closure trust fund to clean up hazardous waste found throughout the Springfield property was consistent with the terms of the closure trust agreement. That agreement provided that the "funds will be available when needed for closure and/or post-closure care of the facility identified in Schedule A." For the same reasons that influence our interpretation of what constituted "the facility" referenced in the insolvency trust agreement, we do not read the closure trust agreement as limiting the use of those funds to remediation only of the two rooms listed in the license. Thus, DEP did not act improperly in refusing to certify closure of HCC's facility as long as remediation was required in unlicensed areas of HCC's property; nor did the judge err in refusing to deem the facility closed.

4. *Conclusion.* For the foregoing reasons, we affirm the judge's order denying the joint motion for an order directing the disbursement of funds in the insolvency trust, and we affirm the judge's order denying Maslab's motion for reconsideration of his order on the joint motion for disbursement.

*So ordered.*