ARTHUR THEOPHILOPOULOS & others[1] *vs.* BOARD OF HEALTH
OF SALEM & another.[2]

No. 13-P-100.

Essex. October 4, 2013. - March 18, 2014.

Present: CYPHER, KATZMANN, & MALDONADO, JJ.

*Department of Environmental Protection. Solid Waste Management. Municipal Corporations,* Board of health. *Department of Environmental Quality Engineering. Administrative Law,* Regulations, Agency's interpretation of regulation, Judicial review. *Statute,* Construction.

Discussion of the statutory and regulatory history and framework of solid waste management site assignments. [94-96]

This court concluded that a city's board of health properly classified a modification of a solid waste transfer station site assignment, submitted by the city and the site's third-party operator, as a "minor" rather than a "major" modification pursuant to the applicable regulation, 310 Code Mass. Regs. § 16.22, where under the plain language of the regulation, none of the enumerated criteria for determining whether that modification was "major" had been met [96-100]; where the city had solicited, and was entitled to rely on, the expertise and interpretation by the Department of Environmental Protection (department) of its own regulations, in that the interpretation was not inconsistent with the plain language of the regulation nor irrational and was therefore entitled to considerable deference [100-102]; and where the historical context illuminated the department's policy reasons for classifying modifications such as the one proposed here as "minor" while also subjecting such modification to a rigorous and demanding approval process as well as to a subsequent lengthy final permitting process before the department [102-103].

CIVIL ACTION commenced in the Superior Court Department on March 18, 2010.

The case was heard by *Howard J. Whitehead,* J., on a motion for judgment on the pleadings, and a motion for reconsideration was also heard by him.

[1]Eighteen property owners and businesses of Salem.

[2]Northside Carting, Inc., intervener.

*Thomas A. Mackie* for the intervener.

*Leonard F. Femino* for the defendant.

*Seth Schofield*, Assistant Attorney General, for the Commonwealth.

*Carl D. Goodman* for the plaintiffs.

CYPHER, J. The question presented for review is whether the Salem board of health (board) properly classified the joint application of the city of Salem (city) and Northside Carting, Inc. (NCI), as one for a minor modification of a site assignment. On appeal to the Superior Court pursuant to G. L. c. 30A, § 14(7), a judge concluded that it had not, and nullified the decision of the board approving the application.[3] We reverse.

*History of the site.* In June, 1960, the board assigned city-owned land in Salem for use as a refuse incineration plant (site).[4] As was common for the time, the board did not place any capacity or volume limitations in the site assignment. Once the incinerator was built, the city disposed of the ash on site in a landfill. By 1968, incineration and landfilling operations had ceased. No governmental entity at any time thereafter sought to rescind, suspend, or modify the site assignment through the imposition of conditions.

On September 9, 1975, the Department of Environmental Quality Engineering (DEQE), the predecessor agency of the Massachusetts Department of Environmental Protection (department), approved the city's plan to construct a solid waste transfer station at the site.[5] DEQE'S plan approval was subject to five

[3]We acknowledge the amicus brief and oral argument of the Attorney General.

[4]The site approved was "that section located on Swampscott Road off Highland Avenue, known as Area 8, in the report of the J. L. Hayden Associates, Inc., dated February 1960." The site is more recently described in the record as a 9.2 acre parcel of land located at 12 Swampscott Road in a mixed commercial, industrial, and residential area.

[5]The approval was based on a set of plans consisting of twelve sheets submitted by the city's engineer, C.E. Maguire, Inc. The plans called for the conversion of a portion of the 6,052-square-foot incinerator building into a transfer station. A transfer station is a "handling facility where solid waste is brought, stored, and transferred from one vehicle or container to another vehicle or container for transport off-site to a solid waste treatment, processing or disposal facility." 310 Code Mass. Regs. § 16.02 (2001). (Unless

conditions, including a weight-receipt limit of 100 tons of refuse per day.[6]

On June 3, 1994, the department approved the city's application, pursuant to 310 Code Mass. Regs. § 19.023(3) (1992), for a permit by rule, finding that the existing transfer station met the department's design and operations standards.[7] See 310 Code Mass. Regs. § 19.200 (1992). The city's application was approved subject to the 100-ton limit and five additional conditions. The 1975 approval, as amended by the 1994 approval, constituted a permit and authorization to operate the transfer station. Since 1994, NCI has operated the transfer station at the site as a tenant of the city, accepting primarily construction and demolition debris and wood.[8]

In April, 2005, following months of negotiations between the department, the city, and NCI regarding the landfill closure and future modifications to the transfer station, the department conditionally approved the city's comprehensive corrective action alternatives analysis plan.

In February, 2007, the city issued a request for proposals for the redevelopment of the site. The city selected NCI's proposal, one of only two received. The high points of NCI's proposal included the tearing down of the smoke stack and the incinerator building, the construction of a new, larger modern transfer station, the capping of the landfill, and the improvement of the

---

otherwise noted, the definitions we quote from the applicable regulations have remained unchanged since their original promulgation.) Since 1975, all waste has been shipped to sanitary landfills in other communities.

[6]At this time, the city was ordered to cover the landfill. In 2000, the city retained a professional engineering consultant, BETA Group, Inc. (BETA), to assist it with the alleged violations of department standards at the landfill and transfer station. In July, 2001, the city, NCI, and the department entered into an administrative consent order with penalty. To date, the city has not complied with the closure order. The cost of capping the landfill is projected to exceed $2 million.

[7]Unlike a site assignment, a solid waste facility permit issued by the department must contain a limit on the amount of waste that can be accepted. See 310 Code Mass. Regs. § 19.043(2).

[8]The transfer station has accepted various types of waste over the years, including municipal solid waste from the Salem public schools and the local housing authority as well as commercial waste. On May 14, 2001, the department approved an application for "modification of large handling facility." No further details about that modification were provided in the record.

internal roads on the site. NCI also sought an increase in the daily average waste receipt limit from 100 tons to 400 tons per day, with a maximum limit of 500 tons per day (project).

*Collateral administrative proceedings.* Before submitting their application to the board, the city and NCI obtained an order of conditions from the Salem Conservation Commission authorizing the work planned by NCI. As required by Massachusetts Environmental Policy Act (MEPA) regulations, they submitted an environmental notification form (ENF) for review by the Executive Office of Energy and Environmental Affairs (EOEEA). See 301 Code Mass. Regs. § 11.03(9)(b)(1) (2008) (requiring such review where, as here, an increase of fifty or more tons per day in solid waste storage, treatment, or processing capacity is sought). In connection with the ENF, the city and NCI submitted a number of expert reports showing that the project would have no significant adverse impact on air quality, noise, human health, and traffic. After receiving a number of written comment letters, the EOEEA approved the project, issuing a certification that the MEPA process was completed and that no environmental impact report was required.[9] See G. L. c. 30, §§ 61-62H; 310 Code Mass. Regs. § 16.08(5)(d)(1)(c) (2001). In the July 25, 2008, certificate, the EOEEA noted that the project would require a minor modification to the site assignment from the board and a solid waste permit from the department.

*Application for a modified site assignment.* In response to the city's request for guidance, John Carrigan, the solid waste management section chief of the department's northeast regional office (NERO), advised the city in an electronic mail message (e-mail) that the modification sought (an increase in capacity) was a minor one "under 310 [Code Mass. Regs. §] 16.00."

---

[9]The current transfer station building has 5,500 square feet. NCI's preliminary plan in the ENF called for an increase in the size of the transfer station building to 7,500 square feet and a horizontal expansion of the footprint of the existing transfer station building from .126 acres to .172 acres. According to BETA's calculations, the proposed new building footprint would exceed the footprint of the existing incinerator building by less than ten percent, including the smokestack. Responding to the concerns of the department, the board, and citizens about the allegedly inadequate size of the tipping floor and the overall building, NCI increased the dimensions of the building from 7,500 square feet (75 x 100) to approximately 9,800 square feet (98 x 100).

Relying on that opinion, on June 23, 2009, BETA Group, Inc. (BETA) submitted to the board on behalf of the city and NCI (applicants) an application for a minor modification to the site assignment. Following public and deliberative hearings on four separate dates in November and December, 2009, the board approved the application subject to forty-three conditions.[10]

*Statutory and regulatory history and framework.* In 1955, the Legislature first passed legislation requiring site assignments for dumping grounds and refuse disposal incinerators. See G. L. c. 111, § 150A, inserted by St. 1955, c. 310, § 1. Several amendments followed over the years, extending the scope of the statute and further regulating solid waste facilities.

Through the Solid Waste Management Act, an emergency act passed in 1987 (act or statute), the Legislature addressed the severe shortage of environmentally safe and financially sound solid waste facilities in the State.[11] See G. L. c. 111, § 150A, as amended through St. 1987, c. 584, § 16; G. L. c. 21H, § 1(*a*)(2), inserted by St. 1987, c. 584, § 3; *TBI, Inc.* v. *Board of Health of N. Andover*, 431 Mass. 9, 11 (2000). At this time, the Legislature instituted a two-tiered site assignment process.[12]

---

[10]The board had before it an extensive documentary record, and the testimony from dozens of witnesses. Professional consultants hired by the board conducted independent peer reviews of the expert reports, finding the supplemental studies properly documented and the analysis consistent with industry standards. The consultants also required additional information and explanations from the applicants at the public hearing, and made recommendations about appropriate conditions to be placed on the board approval.

[11]The Solid Waste Management Act also established seventeen mandatory site suitability criteria and standards, see G. L. c. 111, § 150A 1/2, inserted by St. 1987, c. 584, § 17, and amended the Zoning Act, see G. L. c. 40A, § 9, final par., inserted by St. 1987, c. 584, § 10.

[12]Prior to the 1987 legislation, the department served as an appellate tribunal for persons aggrieved by local board of health site assignments. The statutory site assignment process implemented as part of the act now starts at the department. If the department fails to issue a favorable report, the application is denied. If the department issues a favorable report, the local board holds a public hearing in front of a designated hearing officer and determines site suitability. Local boards of health remain the final arbiters of site assignments and may deny an application for a facility site assignment found suitable by the department. See *TBI, Inc.* v. *Board of Health of N. Andover*, 431 Mass. at 11-12. With one exception, inapplicable here (a facility owned or operated by an agency of the Commonwealth), the department has no authority under the statute to grant site assignments.

See *Wood Waste of Boston, Inc.* v. *Board of Health of Everett,* 52 Mass. App. Ct. 330, 331-332 & n.1 (2001). As herein relevant, the 1987 legislation brought expansions of existing site-assigned facilities within the ambit of the statute and established a statutory permitting process to be followed after the site assignment stage.[13] See G. L. c. 111, § 150A, second, tenth, eleventh pars., as amended or inserted by St. 1987, c. 584, § 16.

Pursuant to the broad rule-making authority granted by the Legislature, the department subsequently adopted separate regulations to govern the siting of solid waste facilities and the permitting of the design, construction, operation, and closure of these facilities.[14] Compare 310 Code Mass. Regs. §§ 16.01-16.99 with 310 Code Mass. Regs. §§ 19.001-19.303.

To resolve lingering confusion about the process required to modify existing site assignments, a subject not covered by the statute or the regulations, the department promulgated 310 Code Mass. Regs. § 16.22 in 2001. This regulation established special procedures for proposed major and minor modifications that do not rise to the level of statutory expansions.[15]

---

[13]The Legislature delegated to the DEQE the task of defining the term "expansion." See *Goldberg* v. *Board of Health of Granby,* 444 Mass. 627, 629 (2005).

[14]Site assignment and permitting are distinct processes that perform different functions. See G. L. c. 111, § 150A; *TBI, Inc.* v. *Board of Health of N. Andover,* 431 Mass. at 15. The purpose of the site assignment process was originally described as "whether a parcel of land is suitable to serve as a site for a solid waste management facility." 310 Code Mass. Regs. § 16.01(1) (1988). The current description of the site assignment process "is to protect public health, safety and the environment by comprehensively regulating: (a) the siting of solid waste facilities . . . ." 310 Code Mass. Regs. § 16.01(1) (2012). The solid waste management permitting regulations focus on facility design and operation. See 310 Code Mass. Regs. § 19.002. While the department and local boards have roles in the site assignment process, the department alone decides whether to issue construction and operating permits. The site assignment proceedings are just one step along a continuum of a "carefully designed," lengthy, and comprehensive statutory and regulatory process. See *Wood Waste of Boston, Inc.* v. *Board of Health of Everett,* 52 Mass. App. Ct. at 337-338.

[15]The department could not pass regulations that conflicted with the statutory procedure for new site assignments or statutory expansions. See *TBI, Inc.* v. *Board of Health of N. Andover,* 431 Mass. at 19; *Goldberg* v. *Board of Health of Granby,* 444 Mass. at 634-635. No claim is made here that the application in this case was subject to the plenary review process set forth in the

The extent of process required turns on the classification of the proposed modification. Any proposal for a "major" modification to a site assignment requires the submission of a new site assignment application to the department. Under the truncated process permitted by the regulation, the department, in its discretion, may limit the review to those statutory criteria affected by the modification. See 310 Code Mass. Regs. § 16.22(2); *Goldberg* v. *Board of Health of Granby*, 444 Mass. 627, 629-630 (2005). If the applicant obtains a favorable report from the department, the statutory process for a new site assignment is followed. See note 12, *supra.*

In contrast, applicants seeking a "minor" modification to the site assignment are not required to file a new application or to obtain a favorable report from the department. See 310 Code Mass. Regs. § 16.22(3). A local board of health may approve a minor modification as long as a public hearing on the matter is held. The board need not consider the site suitability criteria set forth in G. L. c. 111, § 150A½, and 310 Code Mass. Regs. § 16.40. The Supreme Judicial Court has sanctioned the abbreviated review process for both major and minor modifications to existing site assignments. See *Goldberg* v. *Board of Health of Granby*, 444 Mass. at 634-637; *Board of Health of Sturbridge* v. *Board of Health of Southbridge*, 461 Mass. 548, 562-564 (2012).

*Discussion.* This appeal turns on a question of law: whether the project is a major or minor modification to a site assignment within the meaning of 310 Code Mass. Regs. § 16.22. If the modification is major, the project did not receive the more vigorous scrutiny required by the regulation and, thus, the decision of the board was a nullity. Our review is de novo. See *Rosing* v. *Teachers' Retirement Sys.*, 458 Mass. 283, 290 (2010).

We start with the language of the regulation. The modification regulation, 310 Code Mass. Regs. § 16.22, contains five subsections, only two of which are relevant here to our analysis: § 16.22(2) and (3).[16]

Under § 16.22(2), four proposed modifications are deemed

statute. We note that the language of 310 Code Mass. Regs. § 16.22 has remained unchanged.

[16]Section 16.22(1) governs modifications due to a threat to the public

major: (1) "modifications required to '[e]xpand a [s]ite' ";[17] (2) "vertical expansions beyond the limits of an approved plan"; (3) modifications for an alternative use of an assigned site; and (4) "any request to waive any site assignment criterion set forth at 310 [Code Mass. Regs.] § 16.40(3)." If the proposed modification does not fall into one of these four categories or § 16.22(1) (here inapplicable), it is deemed minor. See 310 Code Mass. Regs. § 16.22(3).

We disagree with the judge's conclusion that NCI's proposal met the regulatory definition of "[e]xpand a [s]ite."[18] The record establishes that no move or expansion of the 9.2-acre site assignment is contemplated. It is also undisputed that there is no waste receipt limit stated in the current site assignment. By its plain language, the first category of major modifications was thus inapplicable. The judge's importation of a weight-receipt limit into the site assignment was precluded by the regulatory text as well as the *Goldberg* case.[19]

In *Goldberg*, the original site assignment issued by the local

---

health, safety, or the environment; § 16.22(4) governs requests for *temporary* increases in the daily or annual tonnage limits; and § 16.22(5) governs notices of project changes for MEPA review.

[17]Under the department's definition, to "[e]xpand a [s]ite" means "to move or expand a solid waste facility's operation to a previously unassigned site that is contiguous to the original site or to modify a solid waste facility's operations causing it to exceed any capacity or total volume limit *stated in its current site assignment*" (emphasis added). 310 Code Mass. Regs. § 16.02. These regulations clarify the department's view that an increase in the capacity of a solid waste facility is not necessarily a statutory "expansion." See *Goldberg* v. *Board of Health of Granby*, 444 Mass. at 629-630.

[18]In interpreting the modification regulation, the judge unduly focused on operations, a subject that will be addressed by the department during the permitting process. The judge concluded that the proposed project was "designed precisely to enable the facility to 'exceed [the] capacity or total volume limit stated in its current site assignment' . . . and [thus] sought to 'Expand a Site.' " Reconciling the language regarding limits appearing in both the "Expand a Site" definition of § 16.02 and the minor modification provision of § 16.22(3), the judge distinguished proposals requiring structural alterations or the construction of a new transfer station (which he viewed as major modifications) from simple requests to increase capacity that do not result from the modification of operations (which he viewed as minor modifications).

[19]In his memorandum of decision on the motion to reconsider the judgment filed by the board and NCI, the judge ruled that "[a]lthough the original site assignment contained no tonnage limits — apparently because none was

board "contained no limitation on the height or volume of the landfill." *Goldberg* v. *Board of Health of Granby*, 444 Mass. at 629. The subsequent permit issued by the department, however, did contain a limit (approximately 1.5 million cubic yards). See *id.* at 628-629. In its original application to expand the landfill, the operator made representations about the expected maximum lifetime capacity. In affirming the judgment of the Superior Court paving the way for the vertical addition of two million yards of new solid waste on top of the existing landfill, the Supreme Judicial Court resisted attempts to incorporate these "unstated" conditions into the site assignment. See *id.* at 628-631 & n.4. The *Goldberg* case controls here, prohibiting implied conditions from being read into the board's site assignment.

Furthermore, as discussed previously, see notes 12 and 14, *supra*, the site assignment and permitting processes are distinct. The importation of a permit condition into the site assignment was contrary to the statutory and regulatory scheme.

The judge did not address the other three categories of major modifications. We conclude that the plaintiffs failed to meet their burden of demonstrating the invalidity of the administrative determination that a minor modification was implicated by the project. See *Board of Health of Sturbridge* v. *Board of Health of Southbridge*, 461 Mass. at 562.

To the extent that the plaintiffs maintain that the project falls into the second category of major modifications, a "vertical

---

required at the time — it would appear that the limits established by the [department]'s permit by rule and the Salem City Ordinance (Code 1973, § 13-3; Ord. of 2-28-2002, § II) have since attached to the site by reason of established practice. . . . [The department] may impose tonnage limits that, at least de facto, become site assignment conditions." The plaintiffs' counsel incorrectly stated that the city ordinance requiring the transfer station to be operated in accordance with its 100-ton per day permit predated the department's permit restrictions. In fact, the 1973 Salem Code of Ordinances contained no weight-receipt limitation. Although up until the 1987 legislation, site assignments were subject to the provisions of any local ordinances adopted under G. L. c. 40A, here, the 1960 site assignment was not subject to this later-adopted city ordinance. The ordinance of 2-28-2002 requiring that the transfer station be operated in accordance with its 100-ton per day permit imposed no new use restrictions. Cf. G. L. c. 40A, § 9; *Freetown* v. *Zoning Bd. of Appeals of Dartmouth*, 33 Mass. App. Ct. 415, 419 (1992) (noting that special permits imposing reasonable conditions on operation of solid waste facility are permissible).

expansion" is a term generally applied to landfills, and not to transfer stations. See 310 Code Mass. Regs. § 19.006 (defining expansion as "in the case of . . . handling facilities, an increase in the waste handling, treatment or processing capacity beyond the tonnage limits approved in the permit; and, in the case of landfills, a horizontal or vertical increase in the size of a facility beyond the horizontal or vertical limits specified or approved in the permit"). More importantly, not only is there no evidence of the existence of any vertical limitation in an approved plan here, there is no evidence that the proposed project involves a vertical expansion.[20]

Contrary to the plaintiffs' assertions, the applicants did not request an alternative use of an approved site in their application.[21] Pursuant to DEQE's approval of the change of use, the city began operating a transfer station in 1975 before the adoption of the site assignment regulations, 310 Code Mass. Regs. § 16.00 (1988), and, more particularly, long before the 1990 regulation prohibiting, without a new site assignment, the conducting of different solid waste activities at a site assigned, as here, for a specific purpose.[22] See 310 Code Mass. Regs. § 16.21(1)-(2) (1990).

We can glean no express or implied intent from the text of the regulations or any other source to make the alternative use regulation retroactive.[23] See *Biogen IDEC MA, Inc.* v. *Treasurer*

---

[20]The 1960 site assignment contained no limitations. Neither the 1960 report of J.L. Hayden Assocs., Inc., approved by the board in connection with the incineration plant nor the 1975 plan of C.E. Maguire, Inc., approved in connection with the city's request to construct a transfer station is included in the record. Given the absence of any approved plan, a meaningful comparison of the dimensions of the existing and proposed facilities is impossible. To the extent that the plaintiffs rely on the defendants' figures, NCI's redesigned plan for the transfer station building calls for a twenty-three foot *horizontal* expansion of the footprint. Other facts of record do not establish any vertical expansion beyond the limits of an approved plan.

[21]We note that the plaintiffs' counsel did not raise the change of use theory at the board hearing and in fact failed to object to the chairperson's characterization of the proceeding as a request for "a modification to a previously approved use of this site for solid waste handling purposes."

[22]As explained by the department, unless a local board had restricted the original site assignment to a specific period of time, a rare event not done here, the site assignment allowed the owner or operator to conduct other solid waste activities at the site.

[23]The abbreviated permit-by-rule process was designed to bring existing

*& Receiver Gen.*, 454 Mass. 174, 190 (2009). Cf. *Goldberg* v. *Board of Health of Granby*, 444 Mass. at 638-639 (refusing to apply department regulation increasing setback requirement where operator had reasonable expectation that prior regulation would apply).

Finally, the applicants made no request to waive any site assignment criteria. By operation of 310 Code Mass. Regs. § 16.22(3), the proposed project therefore was deemed a minor modification to a site assignment.[24]

Our interpretation comports with the two opinions of the department secured by the board. "An agency's interpretation of its own regulations is entitled to 'considerable deference' and must be upheld unless it is inconsistent with the plain language of the regulation or otherwise arbitrary or unreasonable." *Mostyn* v. *Department of Envtl. Protection*, 83 Mass. App. Ct. 788, 794 (2013), quoting from *Warcewicz* v. *Department of Envtl. Protection*, 410 Mass. 548, 550 (1991).

Here, the judge improperly refused to give any weight to the advisory opinion of John Carrigan, the solid waste management chief of NERO, because the basis of the opinion was unclear to the judge.[25] While Carrigan's brief e-mail did not elaborate on the parties' previous discussions, the record established that Carrigan, a high ranking department official, had extensive knowledge of the site and the proposed project. As the solid waste management chief, not only did he participate in a number of planning meetings regarding the closing of the landfill and the future of the transfer station, he approved the city's com-

---

transfer stations operating under a pre-1990 plan approval into compliance with department standards. As part of that process, in 1994 the department verified with the board that the city held, among other things, a valid site assignment for an incinerator. At this time, the department did not apply the alternative use regulation to the city's case, which would have required the city to obtain a new site assignment.

[24]Section 16.22(3) also provides two specific examples of minor modifications: "any request to modify conditions established by the Board of Health in the site assignment, or to increase daily or annual tonnage limits." Read in the context of the surrounding language, the tonnage limits referred to in the second example is that stated in the department permit. See *Maslab Liquidation Trust* v. *Commonwealth*, 61 Mass. App. Ct. 1, 11 (2004).

[25]In his April 28, 2008, e-mail to City Solicitor Beth Rennaud, Carrigan stated, "As we discussed previously the change is a minor modification not a major modification under 310 [Code Mass. Regs.] § 16.00."

prehensive corrective action alternatives analysis with respect to the site. NERO also submitted a comment letter regarding the proposed project during the MEPA review and received a copy of the certificate of compliance.

The department's site assignment regulations are technical, complicated, and far from clear. As expressly permitted by the statute, the city sought guidance from the department concerning several aspects of the process, including the major versus minor dichotomy. The board was entitled to rely on the department's expertise and interpretation of its own regulations. See *Goldberg* v. *Board of Health of Granby*, 444 Mass. at 637.

The judge also discounted an opinion from James Doucett, the deputy director of regulatory standards in the department's business compliance division. Doucett indicated that if the current site assignment contains a weight-receipt limit, any proposed modification is deemed major; whereas, if the weight-receipt limit only appears in a permit, as here, the department treats a request to increase tonnage as a minor modification.[26] As further explained by the amicus, the department treats a waste receipt limit found in a site assignment as a local board determination that the site is *only* suitable for a solid waste facility up to the volume of waste specified. Because of the importance of the limitation, the department classified any proposed change in the site assignment limit as a major modification, requiring department review and board reassessment of suitability in light of the criteria deemed relevant by the department. On the other hand, if no tonnage limitation appears in the site assignment, the department assumes that the local board did not ascribe the same importance to the issue, and that therefore, mandatory reassessment by the department and the board of all relevant site suitability criteria would be unwarranted.

These agency interpretations were neither inconsistent with the plain language of the regulation nor irrational and should have been accorded considerable deference by the judge. See

---

[26]The plaintiffs would be hard pressed to assail Doucett's qualifications and basis of knowledge. Between 1999 and 2001, Doucett managed the drafting of the revised site assignment regulations, served as the hearing officer at all public hearings on them, and managed the development of the Response to Comment document and final regulations.

*Ten Local Citizen Group* v. *New England Wind, LLC*, 457 Mass. 222, 228 (2010).

Admittedly, any plan to increase handling capacity fourfold sounds like a major modification. The fact that a tonnage limit appears in one piece of paper alone would not seem to justify the distinction. The historical context illuminates the department's reasons for the difference in treatment. No one would dispute that the amount of daily tonnage handled at a facility may impact public health and the environment. Prior to the promulgation of 310 Code Mass. Regs. § 16.22 in 2001, any operator of a facility with a site assignment containing no waste-receipt limit could increase tonnage without obtaining local board approval.[27] See Response to Comments Summary Revisions to the Site Assignment Regulations 310 Code Mass. Regs. § 16.00, at 12 (issued by the department in June, 2001). Since the statute was silent, the department could have maintained the status quo requiring no local board review. Instead, responding to criticism about the loophole, the department added language to the *minor* modification provision of § 16.22 at the request of a local environmental group. See *Goldberg* v. *Board of Health of Granby*, 444 Mass. at 636 n.12 (noting that "the effect of § 16.22 is to provide an opportunity for scrutiny by the board of a proposed modification that, under a different regulatory approach to the statute, might not be required at all").

Unless limited in time, a site assignment is effective in perpetuity. Pursuant to the 1987 legislation, local boards may not reassess prior site suitability determinations unless a potential threat to the public health, safety, or the environment is involved. See G. L. c. 111, § 150A, twelfth par. The department recognized that local boards assigning sites decades ago without limits may not have fully, if at all, contemplated the public health or environmental impact of increased waste receipt at the site. By bringing the issue of site suitability back before local boards for reconsideration in light of the proposed increase in

---

[27]Under the "Expand of Site" definition adopted in 1988, no expansion of the facility's operations occurred unless the tonnage limit appeared in the site assignment. 310 Code Mass. Regs. § 16.02. As of 1992, however, an operator seeking to increase the tonnage limit would still have to apply to the department for a revised solid waste facility permit. See 310 Code Mass. Regs. §§ 19.006, 19.032(1).

waste, the department furthered the primary purpose of the site assignment process.

For policy reasons, the department decided to classify these modifications as minor and to subject them to a more limited review than major modifications.[28] As the case before us demonstrates, while there is less of a process involved for a minor modification, the process that is required (board review and public hearing before concerned citizens) is rigorous and demanding. The judge may not have approved of the department's classification decision, but it was not open to him to substitute his policy judgment for that of the department.[29] See *id.* at 639.

*Conclusion.* Given the thoroughness of the board's proceedings and its thoughtful decision, it is difficult to imagine how the plaintiffs were actually prejudiced by the use of the minor modification procedure.

The task of obtaining governmental approval for the new transfer station is far from over. We have dealt here only with the site assignment process. The applicants face a lengthy permitting process before the department.

In order to obtain authorizations to construct and to operate the new facility, the city and NCI must submit their final design plans for extensive environmental and engineering review by the department. Another round of public comment will follow. If the department approves the plans, it may impose additional conditions, including changing the location of the building to meet department standards. Any party aggrieved by the department's permitting decision will have a full right to judicial review under G. L. c. 30A.

The judgment of the Superior Court is vacated. The case is remanded for the entry of a new judgment affirming the decision of the board.

*So ordered.*

---

[28]The department could have decided, in the exercise of its expertise and authority, that this process was the best way "to avoid duplicative or nonproductive reviews." *Goldberg* v. *Board of Health of Granby*, 444 Mass. at 635.

[29]Based on our independent review of the administrative record, we conclude that the plaintiffs have failed to establish that the board's decision should be reversed for one of the reasons set forth in G. L. c. 30A, § 14(7). See *Board of Health of Sturbridge* v. *Board of Health of Southbridge*, 461 Mass. at 562.